1

2

3

4

5

6

7

8          IN THE UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10    EARL JOSEPH CHRISTOPHER,

11              Petitioner,                    No. CIV S-09-3044-LKK-TJB

12        vs.

13    JAMES A. YATES,

14              Respondent.              FINDINGS AND RECOMMENDATIONS

15    _____/

16                        I.  INTRODUCTION

17        Petitioner Earl Joseph Christopher is a state prisoner proceeding pro se with a petition for

18    writ of habeas corpus pursuant to 28 U.S.C. § 2254.  For the following reasons, it is

19    recommended that the habeas petition be denied.

20                      II.  PROCEDURAL HISTORY

21        On September 22, 2006, a Sacramento County jury found Petitioner guilty of:  (1) assault

22    on a child resulting in death, CAL. PENAL CODE § 273ab (count one); and (2) second degree

23    murder, CAL. PENAL CODE § 187(a) (count two).  Clerk's Tr. vol. 1, 230-31; *see* Lodged Doc. 4,

24    at 1.

25        On October 26, 2006, the trial court sentenced Petitioner to twenty-five years to life for

26    his conviction of count one.  Clerk's Tr. vol. 1, 9; *see* Lodged Doc. 4, at 1.  The trial court

1   imposed but stayed a fifteen years to life term for his conviction of count two.  Clerk's Tr. vol. 1,

2   9; *see* Lodged Doc. 4, at 1-2.

3        Petitioner directly appealed to the California Court of Appeal, Third Appellate District.

4   *See* Lodged Doc. 1.  On September 9, 2008, the California Court of Appeal issued a reasoned

5   decision modifying the judgment to give Petitioner 828 days of presentence custody credit, and

6   affirming the judgment in all other respects.  Lodged Doc. 4, at 52-53; *see People v. Gulley*, No.

7   C053963, 2008 Cal. App. Unpub. 7348, at *66-67 (Cal. Ct. App. Sept. 9, 2008).

8        On October 16, 2008, Petitioner filed a petition for review with the California Supreme

9   Court.  *See* Lodged Doc. 5.  On October 31, 2008, California Supreme Court allowed Petitioner

10  to join and adopt by reference the issues raised in co-defendant Renecha Marie Gulley's petition

11  for review filed with the California Supreme Court.  *See* Lodged Docs. 6-7.  On December 17,

12  2008, the California Supreme Court denied the petitions without comment or citation.  *See*

13  Lodged Doc. 7.

14       On February 25, 2009, Petitioner filed a petition for writ of habeas corpus with the

15  Sacramento County Superior Court.  *See* Lodged Doc. 8.  On April 15, 2009, the Superior Court

16  issued a reasoned decision denying the petition.  *See* Lodged Doc. 9.

17       On November 2, 2009, Petitioner filed the instant federal habeas petition.  *See* Pet'r's

18  Pet., ECF No. 1.[1]  On April 5, 2010, Respondent filed an answer, *see* Resp't's Answer, ECF No.

19  10, to which Petitioner filed a traverse on August 3, 2010, *see* Pet'r's Traverse, ECF No. 17.

20

21

22   ───────────────

23       [1] The Case Management/Electronic Case Files (CM/ECF) docketing and file system is
     implemented, which allows the parties to electronically file pleadings and documents.  For

24   pleadings or documents submitted in paper format, the filing is scanned and stored electronically
     into the CM/ECF system, except for lodged documents.  Each page of the electronic filing is

25   numbered chronologically, whether or not the party numbered it.  If the filing is lengthy, the
     document is divided into parts.  Here, when a page number for a filed pleading or document is

26   cited, the CM/ECF page number is used when available, which may not coincide with the page
     number that the parties used.

III.  FACTUAL BACKGROUND[2]

***Prosecution Evidence Before Both Juries***

On July 18, 2004, at 8:45 a.m., the Sacramento Metropolitan Fire Department was dispatched to a call for a child who had fallen out of bed.  A fire engine and ambulance arrived at the scene together at 8:51 a.m. Thomas Dunne, a paramedic firefighter, arrived in the ambulance.  Dunne testified that as he was pulling the ambulance gurney out a man carrying a small child walked up and set the child on the gurney. The child (three-year-old Christopher Thomas)[3] was limp and not responding at all.  Dunne was not expecting this as usually a fall with a head injury is a bump on the head.

Christopher was breathing, but his jaws were clenched tight. Dunne rubbed Christopher to wake him up, but Christopher did not move.  When Dunne pinched Christopher's hand hard, one arm moved a little bit.  When Dunne lifted the T-shirt Christopher was wearing, he saw bruises everywhere, including on Christopher's chest, hip, buttocks, and back.  He also noticed burn marks on Christopher's lower extremities.  Although Christopher's pupils were initially the same size, on the ride to the hospital, one of Christopher's eyes became "blown," which means the pupil became really big, eventually becoming fully dilated. Christopher's eyes deviated to the left.  Christopher's symptoms indicated a bleed in the brain causing pressure on the brain.

The ambulance traveled "code three" to the hospital and arrived at 9:17 a.m.  Christopher was whisked into the emergency room.  He was unconscious and nonresponsive.  Dunne described him as lifeless.

Dr. Kevin Coulter, a pediatrician with a specialty in child abuse and the medical director of the child abuse clinic at the University of California Davis Medical Center[,] was called to help with the medical assessment of Christopher.  Coulter first saw Christopher in the intensive care unit after Christopher's examination in the emergency room and after completion of the initial medical tests. The CAT scan of Christopher's head revealed a subdural

---

[2] These facts are from the California Court of Appeal's opinion issued on September 9, 2008.  Lodged Doc. 4, at 2-18.  Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996, a determination of fact by the state court is presumed to be correct unless Petitioner rebuts that presumption with clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see Moses v. Payne,* 555 F.3d 742, 746 n.1 (9th Cir. 2009); *Davis v. Woodford,* 384 F.3d 628, 638 (9th Cir. 2004).

[3] Due to the similarity in names between the victim Christopher Thomas and [Petitioner] , we will refer to the child victim simply as Christopher.  We will refer to [Petitioner] as [Petitioner].

hematoma, a bleeding over the surface of the brain between the brain and the skull. The bleeding in Christopher's head covered the left side of his brain and was also underneath the brain, causing pressure on his brain. The brain had become swollen and the combination of swelling and blood had shifted Christopher's brain to the right. There was no evidence of a skull fracture or injuries to the spinal cord. Coulter originally thought there was not only fresh subdural blood on Christopher's brain, but also old blood. He later revised that opinion to conclude all of the blood was from a recent acute hemorrhage. Christopher's condition was grave on his arrival at the hospital.

In order to control the swelling of Christopher's brain, Christopher was taken into surgery even though he was not in a stable condition. Neurosurgeons removed a bone flap from Christopher's skull in order to try to suction blood off the brain and allow space for his brain to swell out of the opening. Christopher became very unstable during surgery, suffering a 15- to 45-minute period of time in the operating room when he needed cardiopulmonary resuscitation. Christopher's brain was not in a condition where Christopher could be saved. The brain death protocol was started with a first exam at 10:00 p.m. on July 18, 2004. The exam showed Christopher's brain had died. When a second exam confirmed the result, Christopher was declared legally dead on July 19, 2004.

Coulter testified Christopher had a number of bruises and other injuries on his body. There were parallel lines of bruising on the front of his chest, a bruise below his knee, areas of injury to his left forearm, an area of healing injury to his wrist, a healing abrasion on his right upper thigh, an injury to his upper cheek right below the left eye, older burn scars on his lower leg, and bruises on his right thigh, right hip, over his right buttocks, on his right shin, on his back and on the front and back of his right upper arm. Although the bruises below the knee were consistent with accidental injury, the bruises in the other areas were more likely inflicted injuries. Some of the bruising was consistent with grasping injuries; others were consistent with an object impacting Christopher's body. Coulter testified the injuries were not the result of medical intervention. In Coulter's opinion, all of the bruising except the scars was inflicted within the previous nine days. None of the injuries from the neck down were life-threatening.

Coulter opined Christopher's brain injury was the result of an acceleration/deceleration action similar to what happens in a car accident or a fall from a balcony. It could have been the result of an impact too, but with an acceleration/deceleration component. A fall from a bed was unlikely to have caused either the fatal head injury or the totality of the bruising. Coulter testified an adult pushing Christopher into a wall with one hand could explain

Christopher's injuries depending on the force of the push and impact.

Coulter testified one single event caused the bleeding on Christopher's brain. However, he explained multiple actions can occur within an event and that "event" really meant episode that "may encompass a multiplicity of actions[.]" Coulter believed Christopher sustained his head injury within 24 hours from his hospital admission, but could not rule out that Christopher was injured twice within such time. Christopher's head injuries could have happened between 4:00 a.m. and 9:00 a.m.

Coulter was shown a video, taken approximately eight hours before Christopher was brought to the hospital, of Christopher interacting with a puppy. Coulter testified it was unlikely Christopher's head injury had occurred at that point. Coulter was also shown a video of a fist fight between Christopher and his five-year-old brother Deon. Coulter testified neither the fight nor any similar interactions caused Christopher's injuries.

Dr. Stephany Fiore, a forensic pathologist, performed an autopsy of Christopher. Fiore noted bruising on Christopher's fingers in addition to the bruises and scars noted by Coulter. The bruise on Christopher's thigh was deep, extending into the fat below the skin. Others were more superficial. All of the bruises and scrapes were fresh injuries that happened around the same time. She estimated the time of the injuries in the realm of hours rather than days prior to death.

Fiore noted three areas of trauma on the outside of Christopher's head: a bruise on his left cheek; a bruise on the left side of his forehead; and another bruise on the left side of the back of his head. Inside his head, Christopher had large subdural hemorrhaging that preexisted the medical intervention. All of the blood was new. The bruises showed Christopher received blows that could have caused the subdural bleeding. One or all three of the blows could have caused the bleed.

Fiore gave the cause of death as blunt force injuries to the head. She testified great force was required to produce these injuries and that it was not medically reasonable to conclude they were caused by a simple fall from a bed. According to Fiore, a child of the age, size and physical capabilities of Deon would not have been capable of inflicting the injuries that caused Christopher's death. The fatal injuries were consistent with being shaken back and forth or being slammed into a wall.

With these types of injuries, Fiore expected a progression of symptoms. Immediate loss of consciousness could occur, from which the injured person might or might not recover. This would be followed by a phase of symptoms caused by the accumulation of

blood within the skull and the swelling of the brain.  Such symptoms would include a change in the level of consciousness, changes in the eyes, and sometimes vomiting.  A loss of consciousness would usually occur within a very short period of time.

Fiore agreed with Coulter that Christopher did not appear to have been injured at the time the video with the puppy was taken.  She believed the injury probably occurred within a few hours of the time 911 was called.  She testified there was a medical possibility that prompt medical attention may have kept Christopher alive, but given his significant head injury she could not say in what condition he would have lived.

### ***Statements Given At The Scene***

At the scene, [Petitioner] identified himself as Christopher's godfather to a deputy sheriff, who arrived with the fire department and ambulance that morning.  He told the deputy Christopher frequently stayed at [Petitioner and defendant Gulley's] apartment.  He had been staying with them for the previous nine days.  [Petitioner] claimed Christopher usually had a new bruise every time he came to visit.

[Petitioner] told the deputy that he left the apartment around 6:00 a.m. to take his wife, defendant Gulley, to work.  Three children were left at the apartment; his nephew Jeffrey Bailey and his godchildren Christopher and Deon.  When [Petitioner] returned, he moved Christopher from the front room into the bedroom because their puppy was messing with Christopher when he was in the front room.  Around 8:00 a.m. [Petitioner] heard a thud in the bedroom.  When he went to check on Christopher, he saw him on the floor, lying next to a speaker box.  Christopher's eyes were open, but he looked dazed.  [Petitioner] brought Christopher out to the front room and put him on the couch.  His head kind of flopped back and he appeared to go to sleep.

[Petitioner] became concerned when he later could not wake Christopher.  He called his wife at work and told her she needed to come home.  [Petitioner] subsequently took Christopher with him to pick up his wife from work and they went together to the VA hospital on Mather Air Force Base.  It turned out there was no emergency facility there.  [Petitioner] declined an employee's offer to call 911 for them.  [Petitioner and defendant Gulley] went home and called 911.

Another sheriff's deputy entered [Petitioner and defendant Gulley's] apartment just after Christopher was picked up by the ambulance.  He observed Jeffrey asleep on a loveseat and Deon asleep on the floor.  When he awoke, Deon told the deputy he had been staying with [Petitioner and defendant Gulley], his

6

godparents, for a number of days.  Deon made a spontaneous statement:  "Please don't put him in jail."  When asked, Deon said he was referring to his godfather.  Deon related that his godfather woke him early that morning and asked where Christopher got his whoopings.  Deon said he did not know and went back to sleep. Deon told the deputy that his godfather had punched Christopher very hard in the chest and demonstrated the punch for the deputy by punching himself with a closed fist.  Deon said his godfather hit Christopher in the same manner during the previous night and Christopher cried really hard.  Deon said he got whoopings from both his godparents and his mother.  Christopher got more whoopings because he was really bad.

### *Defendant Gulley's Interview Statements*

[Petitioner and defendant Gulley] agreed to accompany officers downtown to talk about the circumstances leading to Christopher's hospitalization.  Defendant Gulley and [Petitioner] were placed in adjoining rooms where they could communicate through the common wall.  A videotape of defendant Gulley's interview with Sheriff's Detective Tom Koontz was played at trial.[4]

For the first several hours of the six-hour interview defendant Gulley claimed Christopher was fine when she left for work that morning around 5:30 or 5:45 a.m.  [Petitioner] took her to work and would have been back home around five to 10 minutes later. She said [Petitioner] started calling her at work around 7:30 or 7:45 a.m. saying something was wrong with Christopher and that he was not responding.  Defendant Gulley told her husband that Christopher was probably just tired and to let him sleep. [Petitioner] continued to phone defendant Gulley.  Assured that Christopher was breathing fine, did not have a temperature, and was not cold or pale, defendant Gulley continued to recommend letting Christopher sleep.  Defendant Gulley told [Petitioner] not to call 911 because she thought he was exaggerating.  She became more concerned when [Petitioner] told her he had lifted Christopher's eyelids and that one of the pupils was bigger than the other and that Christopher had fallen off the bed and hit the speaker box.  Defendant Gulley called Kaiser to speak with an advice nurse, but was told they could not give out advice to nonmembers.

Defendant Gulley's manager would not let her leave because she was the only employee at work.  [Petitioner] brought Christopher to the AM/PM to convince the manager defendant Gulley was not lying and needed to leave.  [Petitioner and defendant Gulley] took

---

[4] Although defendant Gulley requests this court view the videotape of this interview, the videotape was never transmitted to this court.  (See Cal. Rules of Court, rules 8.224 & 8.320(e).) We have relied on the transcript of the interviews contained in the clerk's transcript on appeal and the testimony regarding such interviews.

Christopher to the hospital by the Air Force Base, but it did not have an emergency room.  They took him home and called 911.  The only thing defendant Gulley knew happened to Christopher was that he fell off the bed and hit the speaker box.  Defendant Gulley said she was willing to take a lie detector test as she was telling the truth.

When Koontz left the interview room[, Petitioner and defendant Gulley] spoke to each other through the adjoining wall.  After their conversation, defendant Gulley changed her story.  She told Koontz that when she woke up for work she saw Christopher was laying there without his clothes on.  Defendant Gulley told Christopher to go stand in the corner until she left.  Christopher started crying.  Defendant Gulley grabbed him by his arm, but he would not stand on his feet.  He kept falling to his knees.  Defendant Gulley grabbed him, shook him and pushed him towards the corner, telling him to stand in the corner.  Defendant Gulley claimed she only shook Christopher with one hand.  To her it wasn't hard, but to Christopher it probably was.  She said that when she pushed him against the wall, he hit his head.  When she was ready to leave for work, she put clothes on Christopher and laid him down to go to sleep.  She claimed [Petitioner] did not know that she had shaken Christopher.  It did not cross her mind to tell [Petitioner] about the incident when he started calling her at work.  She did not have him call 911 even after he said one of Christopher's pupils was bigger than the other because she did not think he knew what he was talking about and she wanted to see Christopher for herself.  She denied it was because she did not want to get in trouble for shaking Christopher.

When Koontz left the interview room again, defendant Gulley told [Petitioner] through the wall: "Baby? I told them I did it. . . . 'Cause I didn't want you to have to go through all that you're going through over there. . . . It's either me or you, babe. . . . Huh?  'Cause I heard her over there antagonizing you. . . . Everybody is trying to put that shit on you.  I didn't sell.  I didn't sell. . . . They need somebody and it's either going to [be] you or it's going to be me.  Promise to stay by my side.  Okay?"  When Koontz returned and asked defendant Gulley if she was trying to protect somebody, she said she was telling the truth and she was not just saying she did it.[5]  In a later conversation with [Petitioner] through the wall, she told him they would have to let him go now.

The next day Koontz interviewed defendant Gulley again.  The tape of that interview was also played for the jury.  Defendant Gulley told Koontz that Christopher was awake when she got up for work and that he had taken his clothes off.  Defendant Gulley

---

[5] She refused to take an offered lie detector test at this point, but later said they could give her the test as to whether she only disciplined Christopher by spanking him.

told him to get up and put some clothes on.  Christopher just sat there, so defendant Gulley told him to go stand in the corner. Defendant Gulley brushed by Christopher as he was standing in the corner.  She bumped him and he fell.  She picked him up by his arm to get him to his feet, but he kept falling to his knees.  She instructed him to stand up and get in the corner.  She "kind of projected him" towards the corner and he fell and hit his head. After about five minutes, she told Christopher to go lay down and he walked over and laid down.  She went to work.  She told [Petitioner] not to call 911 even after several of his phone calls to her at work because she wanted to wait and see if Christopher would wake up.[6]

### *Jeffrey's and Deon's Trial Testimony*

At trial, Deon testified Christopher got in trouble the night before his death.  He thought Christopher was spanked or put in a corner. Christopher got punished by [Petitioner and defendant Gulley] a lot of times.  Defendant Gulley spanked Christopher with a big belt, an electric cord, and a spoon.  [Petitioner] spanked him with a belt and a big lace.  Both [Petitioner and defendant Gulley] hit Christopher with their hands.  Deon thought [Petitioner] threw Christopher and that was how Christopher got killed.  Deon heard the army video game [Petitioner] was playing pause and then heard a bam or a boom on the wall, like something hit the wall. Christopher cried.  Defendant Gulley was not there at that time in the morning.

[Petitioner's] nephew Jeffrey testified at trial.  He was 10 years old at the time of Christopher's death.  Jeffrey testified Christopher got in trouble on the morning of his death when he peed on himself. Defendant Gulley told Christopher to go to the bathroom and he had to stand in the corner for awhile.  [Petitioner and defendant Gulley] then left so defendant Gulley could go to work. Christopher kept crying for some juice after [Petitioner and defendant Gulley] left.  Jeffrey testified Deon, bothered by Christopher's crying, kicked/pushed Christopher.  Christopher fell and hit his head on the coffee table.  Christopher cried and held and rubbed his head.  Christopher was dizzy.  He laid down on the couch.  According to Jeffrey, Christopher had bruises from what Deon did.  Deon did not like Christopher and always hit him with toys and stuff when [Petitioner and defendant Gulley] were not looking.  Jeffrey admitted he went to visit [Petitioner] in jail a lot of times, but denied his family talked to him about what to say to help his uncle.

Sacramento Sheriff's Detective Kelly Clark testified he spoke with Jeffrey on July 18, 2004 around 10:45 a.m.  Jeffrey never told

---

[6] She offered to take a lie detector test during the course of the July 19 interview.

Clark that Deon kicked Christopher causing him to hit his head. Jeffrey not only said he never saw Deon hit Christopher, but he said he never saw anyone hit Christopher.

Jeffrey's mother testified she took Jeffrey to see [Petitioner] in jail a number of times, but denied [Petitioner] suggested Jeffrey should testify that [Petitioner] did nothing to Christopher or that she suggested to Jeffrey what he should say in court.

### ***Prosecution Evidence Before Defendant Gulley's Jury Only***

One of the sheriff's deputies who responded to assist with the injured child call spoke with defendant Gulley at the apartment. Defendant Gulley said she was the godmother of Christopher and Deon. Defendant Gulley told the deputy it was not uncommon for her to keep Christopher and Deon for weeks or months at a time. She thought their mother was not a very good mother and that she abused the children. Christopher would frequently come over with bruises. She allowed the deputy to enter the apartment to check on the two children remaining there.

Defendant Gulley wanted to show the deputy where Christopher fell. She took him to the bedroom where she moved a speaker from at least three feet away from the bed closer to the bed and said that was where it had been when Christopher fell.

Defendant Gulley told the deputy that the previous night Christopher ate a good dinner, had fun, and stayed up to 10:00 or 10:30 p.m. Christopher got up around 3:00 a.m. and asked for a drink of water. Defendant Gulley told him no and to go back to bed. Nothing was wrong with Christopher at that time. Christopher was still asleep when defendant Gulley got up for work around 5:45 or 6:00 a.m. At that time the other boys were still playing videogames. [Petitioner] drove her to work at the AM/PM around 6:00 a.m. She received the first of several phone calls from [Petitioner] telling her Christopher fell out of bed and was not responding around 7:45 a.m. He called her five to seven times, but she could not leave work as she was the only employee there. [Petitioner] brought Christopher to the AM/PM and defendant Gulley took him in to show her manager. After her manager turned her back on them, defendant Gulley carried Christopher back to the car and they left. Defendant Gulley described Christopher at that time as lifeless.

[Petitioner and defendant Gulley] went to the Mather hospital, but were told they could not be helped. Since they did not know what was wrong with Christopher, they took him home and called 911.

Robert Piispanen, a coworker of defendant Gulley, testified he was woken up by a phone call from defendant Gulley at 7:15 a.m., at the latest 7:25 a.m., on July 18, 2004. Defendant Gulley told him

she was not able to work that day as her godson was sick.  She was going to take the child to the hospital.  Piispanen asked why her husband could not take the child, but agreed to come into work to cover defendant Gulley's shift.  Piispanen got to the AM/PM around 8:15 or 8:30 a.m.  Defendant Gulley and her husband left with the child.

### *Defense Evidence Before Both Juries*

Defendant Gulley testified on her own behalf.  She denied striking Christopher the morning he was taken to the hospital.  She said she did not slam him against the wall and she did not cause any bruising.  She denied doing anything to cause Christopher's death.  She admitted she told [Petitioner] not to call 911 even after his third phone call to her.  She said she thought Christopher's responses sounded normal and his injuries were not that severe.

Defendant Gulley decided to take the blame for Christopher's injuries after talking to [Petitioner] while they were in custody.  [Petitioner] told her he would take the blame.  Defendant Gulley felt hurt because she did not believe he caused the injuries and she did not want him to take the blame.  She decided to take the blame instead.  Her statement to Koontz after that conversation was not truthful.  She felt pressured by the officer.  She thought if she told the officer something to satisfy him, she would be arrested and [Petitioner] would be set free.  Even though both of them were subsequently arrested, she stuck to her story the next day because she believed her innocence would be shown.  Something would show Christopher's fatal injury was from falling off the bed and hitting his head.

### *Defense Evidence Before Defendant Gulley's Jury Only*

Dr. Richard Ofshe, a professor of social psychology and expert on police interrogations and the manner in which a person can be manipulated into giving a false confession, testified before [Petitioner's] jury.  He testified regarding police interrogation techniques and correlated some of those techniques to Koontz's interview of defendant Gulley.  Ofshe had listened to the communication between [Petitioner and defendant Gulley] while they were being interrogated and believed her subsequent confession was consistent with defendant Gulley's testimony that she confessed to match [Petitioner's] offer to do it for her.  Ofshe felt defendant Gulley's confession was contaminated in the sense that Koontz shaped the confession by suggesting what it should contain.

## IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state

11

court can be granted only for violations of the Constitution or laws of the United States.  28

U.S.C. § 2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v.*

*Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)).

This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to,

the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *Lindh v. Murphy*, 521

U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359, 362 (9th Cir. 1999).  Under

AEDPA, federal habeas corpus relief also is not available for any claim decided on the merits in

state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceeding.

28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v.*

*Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

In applying AEDPA's standards, the federal court must "identify the state court decision

that is appropriate for our review."  *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005).

"The relevant state court determination for purposes of AEDPA review is the last reasoned state

court decision."  *Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir. 2008) (citations omitted).

"Where there has been one reasoned state judgment rejecting a federal claim, later unexplained

orders upholding that judgment or rejecting the same claim rest upon the same ground."  *Ylst v.*

*Nunnemaker*, 501 U.S. 797, 803 (1991).  To the extent no such reasoned opinion exists, courts

must conduct an independent review of the record to determine whether the state court clearly

erred in its application of controlling federal law, and whether the state court's decision was

objectively unreasonable.  *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000).  "The

question under AEDPA is not whether a federal court believes the state court's determination

was incorrect but whether that determination was unreasonable--a substantially higher

1   threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410).

2   "When it is clear, however, that the state court has not decided an issue, we review that question

3   *de novo*." *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006) (citing *Rompilla v. Beard*,

4   545 U.S. 374, 377 (2005)).

5                                       V.  CLAIMS FOR REVIEW

6          The petition for writ of habeas corpus sets forth two grounds for relief.  In ground one,

7   Petitioner argues the trial court abused its discretion when it discharged Juror No. 1 during

8   deliberations, denying Petitioner his right to a fair and impartial jury.  *See* Pet'r's Pet. 20-21.

9   Second, Petitioner contends trial counsel rendered ineffective assistance.

10         A.  Ground One:  Removal of Juror No. 1

11         Petitioner contends the trial court abused its discretion by removing Juror No. 1 during

12  deliberations, "when it was not shown by a demonstrable reality that the juror was unable or

13  unwilling to deliberate."  *Id.* at 21.  Petitioner argues he "did not get a fair trial in that the [trial

14  c]ourt dwelved [sic] into the [j]ury's deliberative process" by dismissing Juror No. 1, violating

15  Petitioner's "constitutional right to a fair and impartial trial."  *Id.* at 48.

16         1.  State Court Decision

17         Here, the state court decision appropriate for review is the California Court of Appeal's

18  decision because it is the "last reasoned state court decision" to address Petitioner's removal of

19  Juror No. 1 claim.  *Delgadillo*, 527 F.3d at 925 (citations omitted).  The California Court of

20  Appeal rejected Petitioner's claim, stating in relevant part:

21         **A.  *Background Information***

22         [Petitioner's] jury began deliberations late in the day and continued
           deliberating all the next day.  They requested read-back of several
23         witnesses' testimony and reviewed videotapes of defendant
           Gulley's interviews with Detective Koontz.  On the next day of
24         deliberations, the bailiff reported Juror No. 1 had approached him
           and told him she felt she was being targeted and verbally attacked
25         in the deliberation room by several jurors, including the foreperson.
           She felt her opinion was not making a difference and that she was
26         not being given a chance to express her opinions.  She said the jury

                                               13

foreperson asked her to remove herself from deliberations, but she refused.

In response, the trial court interviewed both Juror No. 1 and the jury foreperson, Juror No. 9. Juror No. 1 told the court she was being treated with hostility when she expressed her opinion, which varied and differed from the other jurors. Juror No. 1 said one juror told her she was not following the letter of the law and suggested, "Maybe you should leave." Juror No. 1 felt she was following the law. When asked by the court, Juror No. 1 believed she could still continue to deliberate and judge the case fairly and impartially. Juror No. 1 assured the court she was able to follow the instruction that jurors should not be afraid to change their mind if they are convinced they are wrong or hold to their position if they are convinced it is correct.

Juror No. 9, the jury foreperson, believed the jurors were treating each other respectfully and courteously. She understood it was her responsibility to make sure each juror had the opportunity to state their opinion without being treated with hostility. Juror No. 9 thought Juror No. 1 was uncomfortable with what was going on and the other jurors were trying to help her look through the evidence to address her questions. They wanted to help her resolve the issue, not necessarily to change her mind. Juror No. 9 felt she and the other jurors could still openly exchange ideas with each other and Juror No. 1. She asked the court if she should bring it forward if somebody "continues to struggle" and the court said she could bring it to the court's attention if she felt she needed to.

The jury continued deliberations, at one point asking for the legal definition of two terms used in the instructions. However, at the end of the day the jury sent a note to the court asking to meet with it in order to "specifically request the removal of Juror # 1." When the bailiff received this note, he observed obvious hostilities between Juror No. 9 and Juror No. 1. He overheard Juror No. 1 threaten a lawsuit against Juror No. 9.

The next morning, the court decided to interview Juror No. 9 and then the other jurors in descending numerical order finishing with Juror No. 1.

**<u>Juror No. 9</u>**

Juror No. 9 told the trial court nine members of the jury requested the removal of Juror No. 1. The reason for the request was their belief that Juror No. 1 was incapable of making a decision. Juror No. 9 could not say whether this was intentional or unintentional on the part of Juror No. 1. Juror No. 9 described what was happening by an analogy to a team deciding whether a child should have surgery. The team worked through all the issues and came to the end, but one of the team members then says: "But the house is

red."  It was that kind of misunderstanding and failure to correlate the issues that was happening in deliberations.  Originally Juror No. 9 thought Juror No. 1 did not have enough information to make a decision, so the jury requested a lot of information from the court.  Juror No. 9 no longer thought the problem was a lack of information.  She explained the jury was not asking Juror No. 1 to make any particular decision, but just to make a decision.

Juror No. 9 expressed a concern that Juror No. 1 had made a comment that "this is just part of the game."  The other jurors told her "[t]his isn't a game that we're playing."  Juror No. 1 replied: "Well, you don't know what I'm going to do next, do you?"  Juror No. 9 thought this demonstrated a lack of "sincerity to really be a juror and understand what our role is in the system."

Juror No. 9 did not believe Juror No. 1 simply disagreed with the other jurors; she felt Juror No. 1 would not make a decision.  Juror No. 1 would make comments not related to what was being discussed.  The other jurors were frustrated that they could not seem to help her decide.  Juror No. 1 refused to give her position.  She "says the house is red."  The other jurors had told her "undecided" was a decision in their opinion, but they could not even get that out of her.  She constantly sought more information, but Juror No. 9 did not think additional information would satisfy her.

The trial court asked Juror No. 9 if Juror No. 1 was actively deliberating, meaning she was expressing her opinion, considering other opinions, asking questions and evaluating the evidence, the exhibits, and the law.  Juror No. 9 thought she was attempting to do that, although she did not seem able to stay focused.  The jury would be talking about one issue and Juror No. 1 would go off on something else.  She thought the other jurors were frustrated with Juror No. 1, but were not being hostile.

**Juror No. 12**

Juror No. 12 joined in the request for the removal of Juror No. 1.  According to Juror No. 12, Juror No. 1 told them she was "treating this as a game" and that "we have two weeks to figure this out."  She asked:  "Is anybody in a hurry to go back to work?"  She said she was "here for two weeks" and that "I have the option to change my mind as often as I need to."  The jury could not get anywhere.  The jury would discuss a point and reach a point where they felt they could move forward only to have Juror No. 1 go right back to the start.  Juror No. 12 truly felt Juror No. 1 was treating it as a game.  Juror No. 1 told them they had two weeks to "do this" and she thought they needed "to slow it down and take our time."  Juror No. 12 felt Juror No. 1 "just cannot decide."  This was intentional by Juror No. 1.

15

**Juror No. 11**

Juror No. 11 joined in the request for the removal of Juror No. 1. According to Juror No. 11, Juror No. 1 was intentionally unwilling to make a decision.  She seemed to be enjoying the attention she was getting from it. Juror No. 1 told them at the beginning of deliberations that "this is how I'm going to play the game."  Juror No. 11 told her it was not a game; that they were dealing with somebody's life.  Juror No. 1 shrugged her shoulders and kind of blinked at him.  Juror No. 11 thought Juror No. 1 was going off her emotions and not following the law.  Juror No. 11 said Juror No. 1 was deliberating, but "it seems like she's not taking in the information and maybe processing it in the right way, like, 'I don't get it.'"  Juror No. 11 denied there was hostility in the jury room, but felt some of the jurors were "fed up with the way she's trying to gain control of the whole situation."

**Juror No. 10**

Juror No. 10 joined in the request for the removal of Juror No. 1. According to Juror No. 10, Juror No. 1 was not a team player.  She would go back and forth with her decision and kept going "back to day one again."  Juror No. 10 thought it was something more than just disagreeing with the other jurors' decisions.  Juror No. 1 wanted more facts and could not seem to comprehend that whatever they heard in the trial was all they were going to get. Juror No. 10 thought she was intentionally not making a decision based on her comment that "this is her game."  Juror No. 10 did not believe Juror No. 1 was deliberating.

**Juror No. 8**

Juror No. 8 joined in the request for the removal of Juror No. 1. According to Juror No. 8, Juror No. 1 could not make a decision. She waffled back and forth, saying one thing one minute and then, when the rest of the jury thought they were making progress, changing her mind.  Juror No. 1 made comments like, "If you guys are in a hurry to go to work, then you should excuse yourself from the jury."  Juror No. 8 did not think that anybody was in a hurry, but they wanted at least to see progress.  Juror No. 8 felt Juror No. 1 did not want to make a decision.  She says she "thinks one way, but then applies it differently."  Juror No. 8 could not tell if she was intentionally thwarting the process, but Juror No. 8 did not think it was a failure to understand.  He thought Juror No. 1 is intelligent, but "something is going on."  The other jurors were frustrated, but not hostile.

**Juror No. 7**

Juror No. 7 joined in the request for the removal of Juror No. 1. According to Juror No. 7, Juror No. 1 was not following the law.

16

She "just wants to drag it out."  She appeared to think dragging it out would give [Petitioner] more of a fair hearing and she implied the jury should not all come up with the same decision right away. Juror No. 1 would make one decision, then two minutes later she would change her mind.  She was incapable of making a decision and standing by that decision.  Juror No. 7 thought it was intentional.  Juror No. 7 thought Juror No. 1 was enjoying being the center of attention.

**Juror No. 6**

Juror No. 6 abstained from the original vote on the request for the removal of Juror No. 1, but now agreed with the request to remove her.  Juror No. 6 was originally not sure if Juror No. 1 was getting some undue pressure from the others because they were not agreeing with her.  However, Juror No. 6 began to see where the others were coming from when Juror No. 1 came to a verdict, then changed her mind, and then said[,] "Well, I may back off tomorrow."  Juror No. 6 felt Juror No. 1 was unable to make a decision "regardless of what verdict [they] were looking at."  Juror No. 6 thought Juror No. 1 was trying to work through things to the best of her ability for the most part and that she had continued to deliberate, but she was unable to crystallize her viewpoint.  When asked if Juror No. 1 could not make a decision or whether she would not make a decision, Juror No. 6 felt it was "probably both." Although Juror No. 6 thought Juror No. 1 was sensitive and felt she was being picked on, Juror No. 6 did not think Juror No. 1 was being unfairly treated.

**Juror No. 5**

Juror No. 5 agreed Juror No. 1 should be removed.  According to Juror No. 5, Juror No. 1 seemed extremely distressed.  Juror No. 1 would always talk about something that had happened in her life, but she would not say what it was.  She just says, "You don't understand where I'm coming from."  Juror No. 5 said Juror No. 1 "acts like my sister who has -- takes medication for depression." Juror No. 5 did not think Juror No. 1 "will make a decision at all." The stress was obvious on her face and she kept going on about having pain, which Juror No. 5 interpreted as emotional pain. Juror No. 5 thought she might have some sort of mental illness. The other jurors were helpful and kind at the start, but were getting frustrated with Juror No. 1.

**Juror No. 4**

Juror No. 4 agreed Juror No. 1 should be removed.  Juror No. 4 was bothered by Juror No. 1's reference to deliberations as being "a game" and statement that "we have no idea where she's headed."  She felt some of the jurors were in a rush to get back to work and "that those of us who are in a rush to get back to work

17

need to dismiss ourselves off the jury." Juror No. 4 had not seen any proof that anybody was in a rush. All the requests submitted to the court had been made on her behalf. She told them she could make a decision if she had the information, but when they get the information, she does not make a decision or she later backpedals on her decision. She seemed to be having a hard time with cognitive/logical reasoning. Juror No. 4 thought either something was wrong with her thought process or she was intentionally trying to delay the process. Juror No. 4 noted Juror No. 1 made the comment that, "You know we have two weeks. What's the rush? We have two weeks." Juror No. 4 did not get the sense she would be able to make a decision at the end of two weeks. "[S]he just absolutely is incapable of making a decision."

**Juror No. 3**

Juror No. 3 agreed Juror No. 1 should be removed from the jury. Juror No. 3 felt Juror No. 1 was unable to make a decision because "there's something mentally wrong with her." "She just doesn't get it cognitively[.]"

**Juror No. 2**

Juror No. 2 abstained from the jurors' vote to remove Juror No. 1. Juror No. 2 observed the majority of the jurors were very frustrated with her thinking process and admitted[,] "I'm getting to that point myself as well." Juror No. 1 was not making any progress "regardless of what direction." Juror No. 2 felt it was more than just having a different opinion than the other jurors. Juror No. 1 was "just sliding back and forth" and "we can't figure out where she's at." Juror No. 1 was not making any noticeable progress in any direction. Juror No. 2 did not know that Juror No. 1 was necessarily looking at any date as a deadline.

**Summary of Juror Nos. 2-12**

Nine jurors originally requested the removal of Juror No. 1. The two jurors who had initially abstained from requesting her removal joined the request when questioned by the court, making it a unanimous request. Seven of the jurors questioned by the court (Juror Nos. 3, 4, 6, 7, 9, 10, 12) opined that Juror No. 1 was incapable of making any decision, regardless of direction or verdict or even if it was just to be undecided. Two other jurors (Juror Nos. 8 & 11) expressed their opinion in terms of Juror No. 1 being "unwilling" to make a decision. One juror (Juror No. 2) stated Juror No. 1 made no progress, regardless of the direction. One juror (Juror No. 5) focused on her perception of Juror No. 1's mental difficulties. The jurors did not agree on why Juror No. 1 was unable or unwilling to make any decision. Some thought she had mental or emotional issues; others thought she was playing a game or just wanting to fill up the estimated two week time for

deliberations.  None of the jurors based their dissatisfaction with
Juror No. 1 on her failure to agree with them.

**Juror No. 1**

Juror No. 1 said the other jurors accused her of not being able to
make a decision, but she "was not able to make a decision out of
convenience."  She explained that she had reviewed the evidence
they requested the previous day and changed her position, but
when she considered how such change would affect her
conclusion, she did not have the necessary abiding confidence.
She went back to her original position.  "And that's when the
jurors were livid."  She addressed them and recommended they
should excuse themselves if they were feeling time constraints or
pressure from the job.  She denied she typically has trouble making
decisions.  She said she makes decisions "quite easily."

Juror No. 1 said she understood the jury had two weeks to make
their decision.  The court explained it was only an estimate and that
the jury was not required to take that amount of time.  The jury
could take a longer or shorter amount of time.  There were no time
constraints if everybody agreed progress was being made in
making a decision.  Juror No. 1 said she had been under the
impression the jury would meet back in court after the two weeks
expired to give their decision.  She now understood that was not
the case.  Juror No. 1 assured the court she was capable of
expressing her opinions to the rest of the jurors and capable of
making a decision.  She thought the other jurors were frustrated
because she was a little slower.

Juror No. 1 admitted she had used the word "game" in her
discussion with the other jurors, but thought they had taken her
words out of context.  She explained she meant the other jurors
were treating this as a game and wanted her to come on their side.
Otherwise, she would be a loser.  It felt "like a game in the fact that
we're picking teams and sides."

Juror No. 1 expressed surprise when told the bailiff thought he
overheard her tell Juror No. 9 she was going to sue her.  Juror No.
1 denied making any threat to sue anyone.  She denied ever saying
during deliberations that she was experiencing a tremendous
amount of emotional pain.

The court cautioned Juror No. 1 that any decisions were to be
based on the evidence at trial and not on emotions or life
experiences.  Juror No. 1 agreed, but the court noted some
hesitancy.  Juror No. 1 said it was because she was concerned
about other jurors being more emotional than they should be.  She
believed she was still able to continue deliberating with this jury
and make decisions based on the evidence.

**The Bailiff**

The bailiff was sworn and stated for the record his observations when the jury was leaving on the previous evening.  He stated the jury foreperson had a piece of paper in her hand when he walked into the room.  Juror No. 1 said to the foreperson:  "Are you going to -- do you plan on giving him that piece of paper?"  The foreperson told her that she still needed to sign it or it was not completed yet.  The bailiff told everyone it was time to go.  As the jurors filed out of the room, the foreperson handed him the piece of paper.  As soon as she did so, Juror No. 1 came up right next to the foreperson and made a statement to the effect of, "If you give that to him, I'll sue."  The foreperson looked at Juror No. 1 and said, "We'll take care of this first thing in the morning."  Then both of them walked out.  The bailiff described both jurors as agitated.

**Further Interview of Juror No. 9**

The court brought Juror No. 9 back into the courtroom to question her further about the comment overheard by the bailiff.  Juror No. 9 confirmed she handed the note she wrote the day before to the bailiff on the way out for the evening recess.  The jurors told Juror No. 1 exactly what the note said.  When Juror No. 1 asked if she was supposed to come back, they told her she definitely needed to come back as it was the court, not the jury, who decided if she continued.  It appeared to Juror No. 9 that Juror No. 1 was not upset, but felt relieved.  Juror No. 9 said Juror No. 1 did not threaten to sue her.

**The Trial Court's Decision**

After hearing from the parties,[7] the trial court concluded there was no juror misconduct or at least misconduct rising to the level that would warrant Juror No. 1's dismissal and agreed the question was whether Juror No. 1 was incapable of performing her duties.  The court felt Juror No. 1's credibility was an important factor to be considered on that issue.  The court found Juror No. 1 was not credible and it believed the other jurors' description of the comments made in the jury room.  The court felt the comments of the jurors described Juror No. 1 as unable to assist them in making basic decisions for either intentional reasons or emotional or mental health reasons.  Based on the record, the court concluded Juror No. 1 was unable to decide what happened in this case based on the merits of the case.  She was unable to make a decision because of factors and reasons outside of the evidence.  The court acknowledged Juror No. 1 believed she could continue to perform

---

[7] The prosecutor requested the discharge of Juror No. 1 on the basis of her inability to perform the duties of a juror in this case.  Counsel for [Petitioner] suggested there was not enough to warrant removal of the juror.

her duty as a juror, but the court did not believe her.  It granted the prosecution's request to dismiss her under Penal Code section 1089.

## B. *Analysis*

[Petitioner] claims the trial court erred in discharging Juror No. 1 as the other jurors' complaints about Juror No. 1 were really just expressions of their impatience with the failure of Juror No. 1 to agree with them that [Petitioner] was guilty, that Juror No. 1 participated in deliberations to some degree, and that even if she was not deliberating well or was employing faulty logic, discharge was not justified.  [Petitioner] contends Juror No. 1 reasonably explained her comment regarding deliberations being a "game," that her comment should be viewed as "an awkward attempt to defend herself against eleven aggravated jurors[,]" and that such an isolated comment hardly justified her removal.  [Petitioner] contends it was highly improper to remove Juror No. 1 based on Juror No. 1's statement of her emotional pain.  At oral argument, [Petitioner] contended the trial court asked the wrong question by focusing on whether Juror No. 1 could make a decision.  Instead, the sole question should have been whether Juror No. 1 was deliberating.  At argument, [Petitioner] took the position that because Juror No. 1 was physically present and communicating with the other jurors, she was deliberating and so could not be discharged.

. . . .

. . . [W]e conclude the record supports the trial court's decision here to discharge Juror No. 1 because she was either unwilling or unable to make a decision.  The trial court expressly found Juror No. 1 not to be credible and it believed the other jurors' description of what was happening in the jury room.  (*People v. Diaz* (2002) 95 Cal.App.4th 695, 704 [trial court entitled to make credibility finding].)  Viewed through this credibility finding, the nature of the other jurors' comments about Juror No. 1 reveals Juror No. 1's participation in deliberations was illusory.  While the other jurors initially thought Juror No. 1 needed read-back of the evidence and more time for consideration of the evidence, they quite quickly discerned that she was just going through the motions.  She was not actually thinking about the evidence or considering it.  She was playing a game, keeping the others guessing, and arbitrarily extending their discussions to fill the available time.  Her questions and comments were not genuine or sincere.  She was not honestly trying to resolve any questions she had about the evidence or law, but was manipulating the process because she was enjoying being the center of attention or she wanted to prolong jury deliberations to stave off her return to work.  The problem was not that Juror No. 1's opinion differed from the rest of the jurors, but that she had no real opinion.  She was not making progress toward any decision

"regardless of what direction."  Even when told "undecided" was an option, she would not commit to even that much.  She either did not want to or could not make any decision based on something outside the facts and law of the case.

This case is not similar to the cases on which [Petitioner] relies.

. . . .

The thread running through each of [Petitioner's cited] cases is that the erroneously discharged juror had evaluated the facts and law of the case and was expressing a view of the case, which the other jurors could neither accept nor apparently change.  Their complaints about the discharged juror in context were really expressed frustrations with difficult deliberations and differing opinions.  In contrast here, the jury had spent considerable time trying to get Juror No. 1 to make any decision.  All the read-back and questions to the court were made for her benefit, but she failed to come to any decision, "regardless of what verdict [they] were looking at."  Contrary to [Petitioner's] characterization of Juror No. 1 as a model juror unhurriedly working through the evidence, coming to what the other jurors felt was an erroneous decision by possibly flawed mental processes, the record demonstrates Juror No. 1 was not honestly struggling to make a decision, but was playing her own game on a timetable she imposed for some reason outside of the evidence.  She was unwilling or unable to decide the case based on its merits.

The record supports the trial court's conclusion, "'as a demonstrable reality'" ([*People v.*] *Cleveland*, [(2001)] . . . 25 Cal.4th [466,] . . . 485[, 106 Cal.Rptr.2d 313, 21 P.3d 1225]) that Juror No. 1 was incapable of performing her duties as a jury in this case.  The trial court, therefore, did not abuse its discretion in discharging her.

Lodged Doc. 4, at 30-51.

## 2.  Legal Standard for Removal of Juror

The Sixth Amendment guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors.  U.S. CONST. amend. VI; *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).  A trial court's decision to substitute a juror without good cause can establish a Sixth Amendment violation.  *Perez v. Marshall*, 119 F.3d 1422, 1426 (9th Cir. 1997).

Under California law, a trial court may order a juror discharged if the juror dies or becomes ill, or if good cause for the removal is shown.  CAL. PENAL CODE § 1089.  The trial

1   court's authority to remove a juror does not end once the jury begins its deliberations; rather, the

2   trial court can remove a juror "at any time." *Id.* Once it has removed a juror, the trial court may

3   then substitute an alternate juror for the removed juror. *Id.*

4        The Ninth Circuit has consistently held that "the California substitution procedure . . .

5   preserve[s] the 'essential feature' of the jury required by the Sixth and Fourteenth Amendments."

6   *Miller v. Stagner*, 757 F.2d 988, 995 (9th Cir. 1985) (holding trial court did not violate

7   petitioner's right to jury trial by removing two jurors and replacing them with two alternate jurors

8   despite that original jurors were removed on fifth day of jury deliberations), *amended by* 768

9   F.2d 1090 (9th Cir. 1985); *see Perez*, 119 F.3d at 1427; *see also Parker v. Pliler*, 307 Fed. Appx.

10  81, 82 (9th Cir. Jan. 8, 2009) (holding California Penal Code section 1089's "good cause"

11  provision "does not facially violate the Sixth and Fourteenth Amendment right to an impartial

12  jury" (citation omitted)) ; *Diaz v. Alameida*, 223 Fed. Appx. 586, 588 (9th Cir. Feb. 27, 2007).

13       When a petitioner challenges a California trial court's removal of a juror, the reviewing

14  court need only decide whether the application of California's procedure violated the petitioner's

15  Sixth Amendment rights. *Perez*, 119 F.3d at 1426. To make this decision, the reviewing court

16  must determine whether good cause existed to support the juror's removal. *Id.* In making this

17  determination, the reviewing court must be mindful that a trial court's findings regarding juror

18  fitness are entitled to special deference on habeas review. *Id.* (citing *Patton v. Yount*, 467 U.S.

19  1025, 1036-38 & n.12 (1984)).

20       Numerous federal appellate courts have "upheld the dismissal and replacement of jurors

21  whose physical or mental condition prevented them from effectively participating in

22  deliberations." *Id.* at 1427 (collecting cases). The Ninth Circuit has repeatedly denied habeas

23  relief based on the removal of a juror where the juror's illness or emotional instability rendered

24  the juror unable to perform the duties expected of a juror. *See id.* (holding dismissal of holdout

25  juror permissible because juror's emotional instability, which made her unable to continue

26  deliberating, provided good cause for her dismissal); *Miller*, 757 F.2d at 995 (rejecting challenge

23

1  to trial court's dismissal of juror where trial court dismissed juror after juror called in sick on

2  morning of fifth day of deliberations); *see also United States v. Wilson*, 894 F.2d 1245, 1250

3  (11th Cir. 1990) (holding district court did not err in dismissing juror during deliberations due to

4  juror's poor health).

5                  3.  Analysis of Removal of Juror No. 1 Claim

6          Here, the record shows that good cause supported the trial court's decision to dismiss

7  Juror No. 1.  On September 18, 2006, the jury began to deliberate at 3:42 p.m.  *See* Clerk's Tr.

8  vol. 1, 119.  The jury continued deliberating on September 19, 2006, and they requested certain

9  exhibits and the testimony of two witnesses.  *Id.* at 137.  On September 20, 2006, the bailiff

10  informed the trial court that Juror No. 1 approached the bailiff and "felt that she was being

11  targeted, and aggressively attacked, verbally attacked by three of the jurors in the deliberation

12  room, one primarily being the jury foreperson."  *See* Rep.'s Tr. vol. 5, 1347.  The bailiff

13  continued:

14          She feels that her opinion isn't making a difference as far as
           deliberations.  She's not being given a chance to be heard or

15          express her opinion.  The other jurors believe that she's trying to
           hang up the jury.  One juror in particular was verbally aggressive

16          towards her yesterday, wouldn't give her a chance to talk.  She was
           asked to remove herself from deliberations by the jury foreperson.

17          She refused.  She feels that it's -- they're trying to use intimidation
           towards her.

18

19  *Id.* at 1347-48.  The trial court decided to "bring in juror number one and talk to her and

20  determine whether or not she could continue to be fair, impartial, and objective, and continue to

21  openly exchange her thoughts . . . and then to bring in our foreperson, juror number nine, and ask

22  those same questions."  *Id.* at 1348.

23          The trial court interviewed both Juror Nos. 1 and 9.  Juror No. 1 stated, "[N]o one has to

24  endure what I'm enduring."  *Id.* at 1351.  Another juror "started talking, and [Juror No. 1] put

25  [her] eyes down and closed [her] ears.  [Juror No. 1] didn't want to hear, not what she was

26  saying, but the manner in which she was talking to [her]."  *Id.*  Juror No. 1 stated that several

jurors accused her of "not following the letter of the law," although Juror No. 1 felt she was because she "gave [her] opinion based on the letter of the law." *Id.* at 1353.  When the trial court asked Juror No. 1 if she "could still continue to deliberate with this jury and judge this case fairly, impartially, and objectively," Juror No. 1 replied, "Oh yes.  Yes." *Id.* at 1352.

Juror No. 9 informed the trial court that she believed the jurors were treating each other "respectfully and courteously," and she had no concerns about the way jurors were being treated during deliberations by other jurors. *Id.* at 1355.  Juror No. 9 explained that "juror number one is telling us . . . she was uncomfortable with what was going on, and everybody consoled her . . . ." *Id.* at 1356.  "[W]e wanted to have her opinion and we wanted to help everybody resolve the issue, not to convince her to change her mind . . . ." *Id.*  Juror No. 9 stated, "[T]his was everybody talking as well as myself," and they wanted to "help her look through the evidence to feel comfortable with what her questions were." *Id.*  Juror No. 9 felt she could still openly exchange ideas with the rest of the jurors, including Juror No. 1, and she felt the other jurors could too. *Id.* at 1357.  However, at the end of the day, the jury requested to "meet with Judge Earl to specificly [sic] request the removal of Juror #1." Clerk's Tr. vol. 1, 139; *see also* Rep.'s Tr. vol. 5, 1547.

On September 21, 2006, the trial court intended to "bring in the foreperson and ask her . . . why she believes that the removal of juror number 1 is either desired or necessary.  And my inclination is to then talk to the other jurors individually.  The last juror I would speak with would be juror number 1." Rep.'s Tr. vol. 5, 1547-58.  The record reveals the following:

    1.  Juror No. 9 informed the court that the request to remove Juror No. 1 was "on behalf of nine of the jurors." *Id.* at 1550.  Juror No. 9 felt Juror No.1 (1) was incapable of making a decision, *id.* at 1551; (2) lacked sincerity to be a juror and to understand what their role was in the system, *id.* at 1553; (3) felt this was a game, *id.*; and (4) had difficulty focusing, *id.* at 1556.

    2.  Juror No. 12 believed removal of Juror No. 1 was necessary. *Id.* at 1560.  According

to Juror No. 12, Juror No. 1 (1) continually asked if anyone was in a hurry to go back to work, *id.* at 1561; (2) stated this was a game and she had two weeks to figure it out, *id.*; and (3) "just cannot decide" because "she will become very confused and not understand what we're talking about," despite other jurors providing her information, *id.* at 1565-66; *see id.* at 1563.

3. Juror No. 11 believed removal of Juror No. 1 was necessary. *Id.* at 1567.  According to Juror No. 11, Juror No. 1 (1) "was not willing to make a decision," *id.* at 1568; (2) enjoyed the attention she received from being indecisive, *id.* at 1569; (3) stated, "[T]his is how I'm going to play the game," *id.* (internal quotation marks omitted); and (4) was "going off of her emotions" rather than following the law, *id.* at 1571.

4. Juror No. 10 believed removal of Juror No. 1 was necessary. *Id.* at 1573.  According to Juror No. 10, Juror No. 1 (1) "can't make a decision" intentionally, since "our recorder c[a]me in and read off, and all the exhibits that we asked for yesterday was for her benefit," *id.* at 1575-76; and (2) felt "this was a game to her," *id.* at 1576.

5. Juror No. 8 felt removal of Juror No. 1 was necessary. *Id.* at 1578.  According to Juror No. 8, Juror No. 1 (1) "cannot make a decision," *id.*; (2) commented, "If you guys are in a jury to go to work, then you should excuse yourself from the jury[,]" and that was nobody's sentiment, *id.* at 1579; and (3) pulled "personal stuff into her thoughts . . . when we ask her to support stuff," *id.* at 1580.

6. Juror No. 7 felt removal of Juror No. 1 was necessary. *Id.* at 1583.  According to Juror No. 7, Juror No. 1 (1) was not following the law, *id.*; (2) "thinks dragging this out gives the defendant more of a fair . . . hearing," *id.* at 1584; (3) was intentionally not deciding, maybe because "[s]he's enjoying lunch with her daughter at lunch time," *id.* at 1586-87; and (4) "enjoys being the center of attention," *id.* at 1587.

7. Juror No. 6 felt removal of Juror No. 1 was necessary. *Id.* at 1589.  Juror No. 6 had originally abstained from voting to remove Juror No. 1.  *Id.* at 1590.  Juror No. 6

changed his mind when Juror No. 1 "had actually come to a verdict at one point[,] . . . then she backed off, and then she said, 'Well, I may back off tomorrow.'" *Id.* Juror No. 6 then saw "where the others were coming from in the majority." *Id.* Juror No. 6 attributed Juror No. 1's indecision to both Juror No. 1's analysis of the facts and her incapability. *Id.* at 1591. Juror No. 6 felt Juror No. 1 "was being picked on," *id.* at 1593, but was also frustrated because Juror No. 1 "would come to a conclusion" and then "back[] off," *id.* at 1594. Juror No. 6 stated that ultimately, Juror No. 1 was not being treated unfairly, and the other jurors were actually "very nice to [her]." *Id.*

8. Juror No. 5 felt removal of Juror No. 1 was necessary. *Id.* at 1595-96. According to Juror No. 5, Juror No. 1 (1) "always talk[ed] about something that had happened in her life," but did not specify, *id.* at 1596; (2) "wants a lot of quiet time so she can read," *id.*; (3) acted like Juror No. 5's sister who "takes medication for depression," *id.* at 1597; and (4) may have a "mental illness" and "[e]motional pain," *id.* at 1598-99.

9. Juror No. 4 felt removal of Juror No. 1 was necessary. *Id.* at 1601. According to Juror No. 4, Juror No. 1 (1) "made reference to the deliberations as being a game," *id.* at 1602; (2) felt that everyone was "in a rush to get back to work," but "nobody is in a rush," *id.*; and (3) was "incapable of making a decision" despite "giving her" information on what she asked, *id.* at 1604.

10. Juror No. 3 felt removal of Juror No. 1 was necessary. *Id.* at 1606. According to Juror No. 3, Juror No. 1 was unable to decide because "she cognitively cannot comprehend the written instruction, or verbal, or visual." *Id.* at 1607.

11. Juror No. 2 abstained from joining in the request for Juror No. 1's removal. *Id.* at 1609. Juror No. 2 observed that with Juror No. 1, "it's so much slower than everybody else to make progress." *Id.* at 1612. Juror No. 2 felt Juror No. 1 was being treated courteously. *Id.* at 1613.

27

12. Juror No. 1 thought that she was "not capable of making a decision out of convenience." *Id.* at 1619.  Juror No. 1 felt she could make a decision and she could express her opinions, but that the other jurors may not necessarily accept them.  *Id.* at 1622.  Juror No. 1 was under the impression that "we would all meet back here on the 29th and then you would give your decision." *Id.* at 1623.  The trial court clarified that "[y]ou don't have to wait until the 29th," and "[y]ou can take longer than the 29th." *Id.*  Juror No. 1 felt her comment about this being a game was taken out of context, and she meant "it feels like a game in the fact that we're picking teams and sides." *Id.* at 1624.  Juror No. 1 denied she made a threat to sue Juror No. 9 overheard by the bailiff.  *Id.* at 1627-28, 1637-38; *cf. id.* at 1640 (showing Juror No. 9 denying that Juror No. 1 threatened to sue).

The trial court dismissed Juror No. 1 because of her credibility. *Id.* at 1646.  The trial court pointed out that the jury instructions clearly stated, "As soon as you have reached a verdict, let us know." *Id.* at 1647.  The trial court also acknowledged that a couple of jurors stated Juror No. 1 said, "If you're in a hurry to get back to work, you should ask to be excused." *Id.*  The trial court found this implied Juror No. 1 knew "they could leave before the 29th," yet Juror No. 1 expressed to the trial court that she thought "somehow we would all gather here on the 29th and a verdict would be read." *Id.*  The trial court noted the majority of jurors thought Juror No. 1 was incapable or intentionally unwilling to make a decision, but none of them stated she "can't decide what happened *in this case*." *Id.* (emphasis added).  The trial court observed that at least five other jurors have noted that Juror No. 1 "indicated this is a game," and Juror No. 5, in particular, described that Juror No. 1 "continues to tell her about being in pain, some sort of emotional pain." *Id.* at 1648-49; *cf. id.* at 1553, 1561, 1569, 1576, 1602 (showing Juror Nos. 4, 9, 10, 11, and 12 mentioned Juror No. 1 described this as game).  The trial court found these other jurors were credible and sincere, since "[t]hey all heard consistent things." *Id.* at 1649.  Based on the hearing, the trial court found that Juror No. 1, "for either intentional reasons or for emotional or

1  mental health reasons, is unable to assist [the jury] in making decisions," *id.* at 1650, and excused

2  Juror No. 1, *id.* at 1653.

3        This credibility finding is presumed correct.  28 U.S.C. § 2254(e)(1).  The record shows

4  that the trial court discharged Juror No. 1, "not because of [her] status as a holdout juror, but

5  because of [her] emotional inability to continue performing the essential function of a

6  juror-deliberation."  *Perez*, 119 F.3d at 1427.  Given these circumstances and the special

7  deference owed to the trial court's findings, the California Court of Appeal's rejection of

8  Petitioner's challenge to the trial court's removal of Juror No. 1 was neither contrary to, nor an

9  unreasonable application of, clearly established federal law.  Petitioner is not entitled to habeas

10 relief on this claim.

11       B.  Ground Two:  Ineffective Assistance of Counsel

12       In ground two, Petitioner asserts his trial attorney rendered ineffective assistance based on

13 several prejudicial errors.  After exhaustion is addressed and the legal standard is set forth, the

14 alleged prejudicial errors are reviewed as follows:  (1) failure to "move to suppress[] the

15 statement given to the police in violation of *Miranda v. Arizona*[, 384 U.S. 436 (1966)];" (2)

16 "fail[ure] to object to sentencing errors;" (3) failure to call Dr. Charles L. Scott, Roseann Cerrito,

17 or any expert witnesses; (4) failure to call Petitioner's mother as a character witness; (5) failure to

18 perform a psychological evaluation for Petitioner; and (6) failure to impeach Deon's testimony.

19 Pet'r's Pet. 56-58.

20       1.  Exhaustion

21       Respondent contends Petitioner failed to exhaust his ineffective assistance of counsel

22 claim.  Resp't's Answer 32.  Respondent asserts that in any event, these claims should be denied

23 because they are not colorable.  *Id.*  Because exhaustion is a procedural defect that could prevent

24 consideration of any of the claims in the current petition, *Rose v. Lundy*, 455 U.S. 509, 522

25 (1982) ("[W]e hold that a district court must dismiss habeas petitions containing both

26 unexhausted and exhausted claims."), the exhaustion issue is addressed prior to addressing any

1    claim of prejudicial error.

2    a.  Legal Standard for Exhaustion

3    "Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available

4    state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the 'opportunity to pass upon

5    and correct' alleged violations of prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29

6    (2004) (quoting *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (per curiam)).  "The state courts

7    have been given a sufficient opportunity to hear an issue when the petitioner has presented the

8    state court with the issue's factual and legal basis." *Weaver v. Thompson*, 197 F.3d 359, 364 (9th

9    Cir. 1999) (citing *Duncan*, 513 U.S. at 365 (legal basis); *Correll v. Stewart*, 137 F.3d 1404,

10   1411-12 (9th Cir. 1998) (factual basis)).  "A petitioner has satisfied the exhaustion requirement

11   if:  (1) he has 'fairly presented' his federal claim to the highest state court with jurisdiction to

12   consider it, . . . or (2) he demonstrates that no state remedy remains available." *Johnson v.*

13   *Zenon*, 88 F.3d 828, 829 (9th Cir. 1996) (citations omitted).

14   To have exhausted via the first avenue, a petitioner must have presented each federal

15   claim as a federal claim to the California Supreme Court on (1) direct review (e.g., in a petition

16   for review); or (2) collateral review (e.g., in a petition for a writ of habeas corpus).  *See Reiger v.*

17   *Christensen*, 789 F.2d 1425, 1427 (9th Cir. 1986); *see also O'Sullivan v. Boerckel*, 526 U.S. 838,

18   845 (1990); *Hiivala v. Wood*, 195 F.3d 1098, 1106 (9th Cir. 1999) ("To 'fairly present' [a]

19   federal claim to the state courts, [a petitioner] had to alert the state courts to the fact that he was

20   asserting a claim under the United States Constitution." (citing *Duncan*, 513 U.S. at 365-66)).  A

21   "mere similarity between a claim of state and federal error is insufficient to establish

22   exhaustion." *Duncan*, 513 U.S. at 366.

23   A claim is considered exhausted via the second avenue "'if it is clear that [the habeas

24   petitioner's] claims are now procedurally barred under [state] law.'" *Gray v. Netherland*, 518

25   U.S. 152, 162-63 (1996) (quoting *Castille v. Peoples*, 489 U.S. 346, 351 (1989)); *see also*

26   *Valerio v. Dir. of the Dep't of Prisons*, 306 F.3d 742, 770 (9th Cir. 2002) ("[T]he claim is

1  exhausted because it is procedurally barred.").  A claim is also "exhausted because a return to

2  state court for exhaustion would be futile."  *Phillips v. Woodford*, 267 F.3d 966, 974 (9th Cir.

3  2001) (citation and internal quotation marks omitted).

4                                b.  Analysis of Exhaustion

5          The record shows Petitioner failed to raise his ineffective assistance of counsel claims

6  with the California Supreme Court.  On direct appeal to the California Court of Appeal,

7  Petitioner raised two grounds:  (1) the trial court's removal of Juror No. 1 violated Petitioner's

8  constitutional rights; and (2) Petitioner is entitled to actual presentence custody credits.  Lodged

9  Doc. 1, at i.  In his petition for review filed with the California Supreme Court, Petitioner raised

10  one ground, i.e., the removal of Juror No. 1 violated Petitioner's constitutional rights.  Lodged

11  Doc. 6, at 1.  Petitioner was also permitted to join with co-defendant Gulley's petition for review,

12  which raised the following two grounds:  (1) Petitioner's constitutional rights were violated "by

13  the court's improper instruction of the jury on concurrent causation with CALJIC No. 3.41,

14  which was inapplicable on the facts and which lightened the prosecutor's burden of proof;" and

15  (2) the special instruction, based on *People v. Culuko*, 78 Cal. App. 4th 307, 92 Cal. Rptr. 2d 789

16  (2000), violated Petitioner's constitutional rights because it permitted the jury to find Petitioner

17  guilty without making a finding on each element of the offense.  Lodged Doc. 5, at 2.  In

18  Petitioner's state habeas petition filed with the Superior Court, Petitioner raised one ground, i.e.,

19  trial counsel was deficient for "failing to object to inadmissible and prejudicial hearsay"

20  testimony from Officer Jose De La Cruz.  Lodged Doc. 8, at 4; *see also* Rep.'s Tr. vol. 2, 307.

21  Petitioner did not file state habeas petitions with the California Court of Appeal or the California

22  Supreme Court.

23          Petitioner's ineffective assistance of counsel claims are either:  (1) unexhausted because

24  Petitioner failed to present these claims to the California Supreme Court, *Johnson*, 88 F.3d at

25  829; or (2) exhausted because they are procedurally barred, *Phillips*, 267 F.3d at 974 ("The

26  district court correctly concluded that [the] claims were nonetheless exhausted because 'a return

1    to state court for exhaustion would be futile.'") (citation omitted); *see infra* Part V.B.3 (finding

2    alleged errors meritless).

3         Even if Petitioner's claims are unexhausted, an application for a writ of habeas corpus

4    may be denied on the merits, notwithstanding the applicant's failure to exhaust available state

5    remedies.  28 U.S.C. § 2254(b)(2).  A federal court considering a habeas petition may deny an

6    unexhausted claim on the merits when it is perfectly clear that the claim is not "colorable."

7    *Cassett v. Stewart*, 406 F.3d 614, 624 (9th Cir. 2005).  The merits of Petitioner's claims of

8    prejudicial error will be addressed, and this matter is now ready for decision.

9                   2.  Legal Standard for Ineffective Assistance of Counsel Claims

10        The Sixth Amendment guarantees the effective assistance of counsel.  The United States

11   Supreme Court sets forth the test for demonstrating ineffective assistance of counsel in

12   *Strickland v. Washington*, 466 U.S. 668 (1984).  An allegation of ineffective assistance of

13   counsel requires that a petitioner establish two elements:  (1) counsel's performance was

14   deficient; and (2) the petitioner was prejudiced by the deficiency.  *Id.* at 687; *Lowry v. Lewis*, 21

15   F.3d 344, 346 (9th Cir. 1994).

16        First, a petitioner must show that, considering all the circumstances, counsel's

17   performance fell below an objective standard of reasonableness.  *Strickland*, 466 U.S. at 688.  To

18   this end, a petitioner must identify the acts or omissions that are alleged not to have been the

19   result of reasonable professional judgment.  *Id.* at 690.  The federal court must then determine

20   whether in light of all the circumstances, the identified acts or omissions were outside the wide

21   range of professional competent assistance.  *Id.*  "We strongly presume that counsel's conduct

22   was within the wide range of reasonable assistance, and that he exercised acceptable professional

23   judgment in all significant decisions made."  *Hughes v. Borg*, 898 F.2d 695, 702 (9th Cir. 1990)

24   (citing *Strickland*, 466 U.S. at 689).

25        Second, a petitioner must establish that he was prejudiced by counsel's deficient

26   performance.  *Strickland,* 466 U.S. at 693-94.  Prejudice is found where "there is a reasonable

                                                32

1    probability that, but for counsel's unprofessional errors, the result of the proceeding would have

2    been different." *Id.* at 694.  A reasonable probability is "a probability sufficient to undermine

3    confidence in the outcome." *Id.*; *see also Williams,* 529 U.S. at 391-92; *Laboa v. Calderon,* 224

4    F.3d 972, 981 (9th Cir. 2000).

5         A court need not determine whether counsel's performance was deficient before

6    examining the prejudice suffered by the petitioner as a result of the alleged deficiencies.

7    *Strickland*, 466 U.S. at 697.  Since the petitioner must affirmatively prove prejudice, any

8    deficiency that does not result in prejudice must necessarily fail.  However, certain instances are

9    legally presumed to result in prejudice, e.g., where there was an actual or constructive denial of

10   the counsel's assistance, or where the State interfered with counsel's assistance.  *Id.* at 692; *see*

11   *United States v. Cronic*, 466 U.S. 648, 659 & n.25 (1984).

12             3.  Analysis of Ineffective Assistance of Counsel Claims

13             a.   Failure to File a Motion to Suppress Statements

14        Petitioner argues counsel was deficient for failing to file a motion to suppress statements

15   he made to the police during a three hour interview on July 18, 2004.  Pet'r's Pet. 56.  Petitioner

16   also claims that "[a]t no time during that interview was [Petitioner] advised of his right to remain

17   silent and not talk to the police.  At no time during the interview was he advised that he had the

18   right to consult counsel and to have counsel present during the interview." *Id.*

19        Petitioner fails to show that his counsel was deficient in failing to make a motion to

20   suppress or that he was prejudiced by the alleged failure.  The record shows that the July 18,

21   2004, interview was never played to the jury; the transcript was never admitted into evidence;

22   witnesses did not testify about Petitioner's statements during the interview; and counsel did not

23   mention it during closing or opening argument.  Counsel would have no reason to file a motion

24   to suppress the interview because it was not mentioned during trial.  Likewise, Petitioner could

25   not have suffered prejudicial harm from the interview because it was not mentioned during trial.

26   *United States v. Quintero-Barraza*, 78 F.3d 1344, 1349 (9th Cir. 1995) ("Counsel was under no

1   obligation to bring a plainly unavailing motion before the district court."); *James v. Borg*, 24

2   F.3d 20, 27 (9th Cir.) ("Counsel's failure to make a futile motion does not constitute ineffective

3   assistance of counsel."), *cert. denied*, 513 U.S. 935 (1994); *Lowry v. Lewis*, 21 F.3d 344, 346

4   (9th Cir. 1994) ("[The] habeas petition can be well taken, for its deficient performance argument,

5   only if based on the proposition . . . that a lawyer should file a suppression motion in every case,

6   because the defendant has nothing to lose and the lawyer can never be certain that the judge will

7   not suppress the evidence against his client.  We have rejected that argument where the motion

8   would be without merit."  (citation and internal quotation marks omitted)).

9       Petitioner also does not provide evidence of a basis to suppress his statements.  Other

10  than his own claims, Petitioner fails to show he was not actually advised of his *Miranda* rights,

11  or that he was in custody during the three hour interview.  Petitioner claims the interview that

12  counsel should have suppressed occurred on July 18, 2004, and Petitioner was not arrested until

13  July 19, 2004, at 8:18 p.m.  *Compare* Pet'r's Pet. 56, *with* Clerk's Tr. vol. 1, 25.  Petitioner's

14  claim that counsel was deficient for failing to move to suppress his July 18, 2004, interview fails.

15                      b.   Failure to Object to Sentencing Errors

16      Petitioner argues counsel was deficient for failing to object to the trial court's sentence,

17  which gave Petitioner "zero time credit although he had 828 days in custody."  Pet'r's Pet. 57.

18  Petitioner admits the state appellate court corrected this error.  *Id.*; *see* Lodged Doc. 4, at 52.

19  Since Petitioner did not suffer prejudice, Petitioner's claim that counsel was deficient for failing

20  to object at sentencing fails.

21                      c.   Failure to Call Dr. Charles L. Scott, Roseann Cerrito, or Any Expert

22                           Witness

23      Petitioner argues counsel was deficient for failing to put on a defense.  Pet'r's Pet. 57.

24  Specifically, Petitioner contends counsel "failed to call any witness[es] after informing the court

25  and the prosecution that he would be calling at least six expert witnesses and providing a non-

26  exhaustive witness list where he intended to call Charles L[.] Scott, MD, a Forensic Psychiatry

34

1   Expert Witness and a Defense Investigator, Roseann Cerrito." *Id.*

2          Even if Petitioner was able to establish that counsel's performance was deficient, he

3   would be unable to establish prejudice.  To establish prejudice caused by the failure to call a

4   witness, Petitioner must show that the witness was likely to have been available to testify; that

5   the witness would have given the proffered testimony; and that the witness's testimony would

6   have created a reasonable probability that the jury would have reached a verdict more favorable

7   to Petitioner.  *See Alcala v. Woodford*, 334 F.3d 862, 872-73 (9th Cir. 2003).  Petitioner fails to

8   demonstrate any of these requirements.

9          First, Petitioner fails to provide an affidavit from Dr. Scott, Cerrito, or any expert witness,

10  that they would have testified on Petitioner's behalf.  *See Dows v. Wood*, 211 F.3d 480, 486 (9th

11  Cir. 2000) (rejecting petitioner's ineffective assistance of counsel claim where "[the petitioner]

12  provides no evidence that this witness would have provided helpful testimony for the defense -

13  i.e., [the petitioner] has not presented an affidavit from this alleged witness").  Second, Petitioner

14  cannot show that any of these witnesses would have given testimony beneficial to Petitioner.  *See*

15  *id.*; *United States v. Olson*, 846 F.2d 1103, 1111 (7th Cir. 1988) (holding counsel was not

16  ineffective for failing to "properly investigate, interview, and call as witnesses two individuals,"

17  where petitioner "failed to allege specifically what evidence such investigation and interviews

18  would have uncovered"); *see also James*, 24 F.3d at 26 (9th Cir. 1994) ("Conclusory allegations

19  which are not supported by a statement of specific facts do not warrant habeas relief.").

20         Third, given the strong evidence supporting Petitioner's guilt, additional expert testimony

21  would not have created a reasonable probability that the jury would have reached a different

22  verdict.  Deon, Christopher's brother, testified Petitioner and defendant Gulley punished

23  Christopher "lots of times."  Rep.'s Tr. vol. 1, 279.  Defendant Gulley spanked Christopher with

24  an electric cord, a spoon, a big belt, and her hands.  *Id.* at 279-80.  Petitioner spanked Christopher

25  with big laces, a belt, and his hands.  *Id.* at 280.  Petitioner thought that Petitioner threw Christopher,

26  and "that's how he got killed."  *Id.* at 281.

1   [PROSECUTOR:]  Okay.  And what about [Petitioner], what kind
2   of hand did [Petitioner] use to hit Chris[topher]?

    [DEON:]  I think he threw him.
3

4   [PROSECUTOR:]  You think he threw him?

    [DEON:]  Once.
5

6   [PROSECUTOR:]  Why do you think that?

7   [DEON:]  I think that's how he got killed.

    [PROSECUTOR:]  Why do you think that, [Deon]?  Did you see
8   that?

9   [DEON:]  No.  But I heard.  But I found out.

10  [PROSECUTOR:]  Okay.  Did you hear something?

11  . . . .

12  [DEON:]  I heard a bam on the wall whenever -- whenever I was
    looking at something.  I was looking at a pause game.
13

14  [PROSECUTOR:]  So you were playing video games and the game
    was paused?

15  [DEON:]  No, no.  It was like a[n] army game that [Petitioner] was
16  playing.

17  [PROSECUTOR:]  Okay.  And then the game was paused?

18  [DEON:]  Yeah.

19  [PROSECUTOR:]  And you heard a bam?

20  [DEON:]  Yeah.  Right on the wall, like bam.

21  [PROSECUTOR:]  Okay.  And did you look to see what the bam
    was?

22  [DEON:]  No.

23  [PROSECUTOR:]  Did you hear anybody cry?

24  [DEON:]  Yeah.

25  [PROSECUTOR:]  Who did you hear cry?

26  [DEON:]  Chris[topher].

1   [PROSECUTOR:]  Okay.  And did you look to see where
    Chris[topher] was?

2

3   [DEON:]  No.

4   [PROSECUTOR:]  And did you look to see where [Petitioner]
    was?

5   [DEON:]  No.

6   [PROSECUTOR:]  And was [defendant Gulley] there when that
    happened?

7

8   [DEON:]  No.

9   [PROSECUTOR:]  Do you know where [defendant Gulley] was?

    [DEON:]  Don't remember.

10

11  *Id.* at 281-82.

12        Dr. Kevin Coulter, a board certified pediatrician with a specialty in child abuse, was

13  "called in to help with the medical assessment" of Christopher on July 18, 2004.  Rep.'s Tr. vol.

14  2, at 557, 559-60, 567.  At trial, Dr. Coulter testified that a number of Christopher's injuries

15  "attract[ed] [his] attention" because "it pertains to physical abuse."  *Id.* at 583; *see*, *e.g.*, *id.* at

16  584, 587 (noting injuries, *inter alia*, directly over the buttocks, thigh, and upper right arm).  Dr.

17  Coulter also opined that, (1) after watching a video of Deon and Christopher "engaging in a fist

18  fight and being egged on by adults," Deon did not cause Christopher's injuries, Rep.'s Tr. vol. 3,

19  602-03; (2) Christopher did not receive his brain injury or his bruises from falling out of a bed,

20  *id.* at 604; and (3) Christopher suffered from battered child syndrome, *id.*  Dr. Coulter testified it

21  was "one event"[8] that caused trauma to Christopher's head resulting in the bleeding, and "the

22  actual height of the fall is not so much the issue.  It's just the kid has been ejected, you know,

23  thrown, or something. . . . [A]nd so you have this sort of movement of the child in space with the

24  _____

25        [8] Dr. Coulter testified on cross-examination, "We only see evidence of one injury, so one
    would presume it was one event.  Could there have been additional events along with it[?]  [I]t's
26  possible.  Can't -- could not rule that out."  Rep.'s Tr. vol. 3, 608.

1  impact." *Id.* at 601, 608.

2      Dr. Stephany Fiore, a board certified forensic psychologist, performed an autopsy on

3  Christopher on June 20, 2004, at 9:55 a.m.  Rep.'s Tr. vol. 3, 649-50, 653.  Dr. Fiore opined that

4  the cause of Christopher's death was "blunt force injuries to his head."  *Id.* at 676.  Dr. Fiore

5  agreed that these injuries could be consistent with being shaken back and forth, or projected or

6  slammed into a wall.  *Id.*  Dr. Fiore also reviewed the video that showed Christopher "and his

7  brother[, Deon,] engaging in fist fighting activity," *id.* at 684, and did not think Deon would be

8  capable of causing the injuries resulting in Christopher's death:

9          [PROSECUTOR:]  Did you have a chance to review a video that
           was taken also in the week before Chris[topher]'s death that
10         showed he and his brother engaging in fist fighting activity?

11         [DR. FIORE:]  I did.

12         [PROSECUTOR:]  And based upon the activity which you
           observed in that video, do you think it's medially reasonable to
13         conclude that a child of the age and size and physical capabilities
           of the older boy in that video would have been capable of inflicting
14         the injuries which caused Chris[topher]'s death?

15         [DR. FIORE:]  No.

16         [PROSECUTOR:]  And why is that?

17         [DR. FIORE:] . . . [T]here didn't seem to be that much difference
           in their size and their abilities.  Kids rough house all the time.  And
18         we rarely see . . . anything significant coming out of that.  They just
           don't have the strength to produce that type of injury.
19
           I mean, if he was . . . an older person and a boxer and punching
20         somebody in the head then, yes, I could say that a punch in the
           head could do something like that.  But kids just don't have that
21         type of strength to be able to create the forces that are needed to
           produce that type of injury.
22

23  *Id.* at 684-85.  Given the other evidence in the record, Petitioner cannot show that expert

24  testimony on his behalf would have created a reasonable probability that the jury would have

25  reached a verdict more favorable to him.  Petitioner is unable to establish prejudice for counsel's

26  failure to call expert witnesses, and this claim fails.

1            d.  Failure to Call Petitioner's Mother as a Character Witness

2       Petitioner argues that counsel was deficient for "[f]ailing to present evidence of who[]

3 [Petitioner] was by calling witnesses" on his behalf.  Pet'r's Pet. 56.  Specifically, Petitioner

4 noted his mother "remained on-call throughout the duration of the proceedings," yet "[t]here was

5 [sic] no witnesses called who[] could attest to [Petitioner's] character."  *Id.* at 57.

6       Counsel's tactical decision not to call an easily impeachable family witness was

7 reasonable and did not constitute ineffective assistance of counsel.  *See McCauley-Bey v. Delo*,

8 97 F.3d 1104, 1106 (8th Cir. 1996) (finding no prejudice from counsel's failure to call witnesses

9 because impact of uncalled witness would have been negligible due to their close relationship to

10 defendant), *cert. denied*, 520 U.S. 1178 (1998); *Bergman v. Tansy*, 65 F.3d 1372, 1380 (7th Cir.

11 1995) (holding counsel was not ineffective for failing to call family members who would easily

12 have been impeached for bias), *cert. denied*, 517 U.S. 1160 (1996); *Romero v. Tansy*, 46 F.3d

13 1024, 1030 (10th Cir.) (noting testimony by defendant's family members is of "significantly less

14 exculpatory value than the testimony of an objective witness"), *cert. denied*, 515 U.S. 1148

15 (1995); *United States ex rel. Maxwell v. Gilmore*, 37 F. Supp. 2d 1078, 1089 (N.D. Ill. 1999)

16 (stating trial counsel reasonably could have thought petitioner's mother and girlfriend would not

17 be credible alibi witnesses given their "obvious personal interest in his acquittal").  Counsel's

18 decision not to call Petitioner's mother as a defense witness was not ineffective assistance.

19           e.  Failure to Perform a Psychological Evaluation for Petitioner

20       Petitioner argues that counsel was deficient because "[t]here was no psychological

21 evaluation done for [Petitioner] so that his [p]sychologist might be called to testify as to what

22 type of person [Petitioner] was.  Pet'r's Pet. 57.  Petitioner claims this "left the [j]ury to speculate

23 that [Petitioner] was this monster that goes around throwing children against the wall so hard that

24 it causes their death."  *Id.* at 57-58.

25       Here, Petitioner's claim for a psychological evaluation is an ineffective assistance claim

26 for failure to call a psychologist to testify on Petitioner's behalf.  *See id.*  However, like his claim

for expert witnesses, Petitioner fails to provide an affidavit from any psychologists that they would have testified on Petitioner's behalf.  *See Dows*, 211 F.3d at 486.  Petitioner also fails to show that any psychologist would have given testimony beneficial to Petitioner.  *See id.* Petitioner's failure to identify witnesses his counsel allegedly should have called is fatal to his ineffective assistance of counsel claim.  *See United States v. Murray*, 751 F.2d 1528, 1535 (9th Cir. 1985) (finding petitioner's ineffective assistance claim failed where "[p]etitioner does not identify any witnesses that his counsel should have called that could have been helpful"); *see also Moss v. Hofbauer*, 286 F.3d 851, 869 (6th Cir. 2002) (citing *Murray*, 751 F.2d at 1535); *Saunders v. United States*, 236 F.3d 950, 952-53 (8th Cir. 2001) ("[T]he lack of specificity as to both the identity of the conjectural witnesses and the content of their testimony prevents us from assessing whether there was prejudice to [Petitioner's] defense as the result of counsel's performance, that is, whether there is a reasonable probability that the outcome would have been different but for counsel's alleged failings."); *United States v. Castillo*, 814 F.2d 351, 356 (7th Cir. 1987) (holding ineffectiveness not shown where petitioner "does not reveal who the witnesses of such import were and what exactly they would have had to offer that would be so material").  Petitioner ineffective assistance claim for counsel's failure to call a psychologist as a character witness fails.

### f.  Failure to Impeach Deon's Testimony

Petitioner also asserts that defense counsel should have called witnesses "to impeach the damaging testimony of the deceased[']s brother[,] who[] had a motive to lie since it was implied that he had engaged in conduct which caused injury to his deceased brother."  Pet'r's Pet. 58. Petitioner believes a "psychological examination should have been ordered for the deceased[']s brother to determine his propensity for lying."  *Id.*

Petitioner's claim fails for the same reasons as his other ineffective assistance claims. First, Petitioner fails to provide an affidavit from any psychologists that they would have testified on Petitioner's behalf.  *See Dows*, 211 F.3d at 486.  Second, Petitioner cannot show that any

1  psychologist would have given testimony beneficial to Petitioner.  *See id.*  Third, Petitioner

2  cannot demonstrate prejudice because both Dr. Coulter and Dr. Fiore testified that Deon was

3  incapable of causing Christopher's injuries.  Rep.'s Tr. vol. 3, 602 (Dr. Coulter); *id.* at 684 (Dr.

4  Fiore).  Petitioner ineffective assistance claim for counsel's failure to impeach Deon fails.

5                                              VI.  CONCLUSION

6         For the foregoing reasons, IT IS HEREBY RECOMMENDED that Petitioner's

7  application for writ of habeas corpus be DENIED.

8         These findings and recommendations are submitted to the United States District Judge

9  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within twenty-one

10  days after being served with these findings and recommendations, any party may file written

11  objections with the court and serve a copy on all parties.  Such a document should be captioned

12  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

13  shall be served and filed within seven days after service of the objections.  Failure to file

14  objections within the specified time may waive the right to appeal the District Court's order.

15  *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156-57

16  (9th Cir. 1991).  In any objections he elects to file, Petitioner may address whether a certificate of

17  appealability should be issued in the event he elects to file an appeal from the judgment in this

18  case.  *See* Rule 11(a), Federal Rules Governing Section 2254 Cases (district court must issue or

19  deny certificate of appealability when it enters final order adverse to applicant).

20

21  DATED:        February 14, 2011.

22

23

24                              TIMOTHY J BOMMER
                                UNITED STATES MAGISTRATE JUDGE

25

26